185 So.2d 642 (1966)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS, Plaintiff-Appellant,
v.
Thomas J. SINGLETARY, Defendant-Appellee.
No. 6600.
Court of Appeal of Louisiana, First Circuit.
April 4, 1966.
Rehearing Denied May 9, 1966.
*643 Charles Wm. Roberts, of Burton, Roberts & Ward, Philip K. Jones, D. Ross Banister, Glenn S. Darsey and B. B. Croom, Baton Rouge, for appellant.
R. Gordon Kean, Jr., of Sanders, Miller, Downing, Rubin & Kean, Baton Rouge, for appellee.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
BAILES, Judge.
Observing appropriate procedure, the State of Louisiana, through the Department of Highways, filed expropriation proceedings for the taking of certain property owned by defendant-appellee, Thomas J. Singletary. The property involved in this taking formed a part of the home property of Mr. Singletary, and was utilized in the construction of Highway I10, commonly known in these environs as the Baton Rouge Expressway.
With their petition initiating this proceeding the plaintiff filed a certificate of estimate of just compensation executed by the right of way agent and Mr. John LeJeune, a licensed realtor of Baton Rouge, who appeared as a witness for the plaintiff in the trial of this action, certifying the value of land and improvements to be $1,025 and damages in the amount of $7,662. This amount was "rounded off" at $8,700 which was deposited in the registry of the court.
In his answer, the defendant does not question the expropriation per se but does affirmatively allege the property taken is worth $2,000 and the severance damages amount to $38,000.
After trial, the lower court awarded defendant the sum of $1,025 for the property expropriated and the sum of $38,000 as damages. From this judgment, the State of Louisiana appealed.
While the appellant did not set forth as such, any specifications of error, from our study of its brief we conclude the only serious complaint to the ruling and judgment of the trial court is the amount of severance or consequential damages. No objection is raised to the trial court's determination of value of the land expropriated. This amount, incidentally, is the same as that certified as the just amount in the certificate mentioned above. Therefore, we will confine this opinion to the examination of the correctness of the award of severance damages.
The defendant offered the testimony of two expert appraisers, Mr. Verdie Reece Perkins and Mr. Heidel Brown, both prominent realtors of Baton Rouge, and the State *644 of Louisiana offered the testimony of Mr. Leroy Cobb and Mr. John LeJeune, who were also qualified as experts in the field of appraising real estate.
To better understand the question to be resolved it is well to detail briefly the physical setup of Highway I10 and the defendant's property.
Defendant's property is located in the corporate limits of the City of Baton Rouge in the City Park Lake area between City Park and Louisiana State University. Extending from City Park to within the campus of the University is Dalrymple Drive. This street is on the west side of and follows the meanderings of City Park and University lakes. In front of Defendant's property Dalrymple Drive courses north and south and Mr. Singletary's property is perpendicular thereto. There were no buildings or other structures whatever located between Dalrymple Drive and the lakes in the vicinity of defendant's property prior to the construction of Highway 10.
The directional location of Highway I10 is not perpendicular to Dalrymple Drive but courses an angle from the northeast to the southwest. The property of Mr. Singletary is located on the right outbound or south side of the expressway. As the expressway approaches the elevated crossing of Dalrymple Drive and City Park Lake, a downramp takes off on the right or south side, runs along the north side of the Singletary property. As this downramp descends to Dalrymple Drive, it veers or turns to the right as it converges with Dalrymple Drive. The convergence is flared for access to Dalrymple. At this junction there are semaphore signals for control of traffic.
For the construction of the flare at the point of confluence of the downramp and Dalrymple Drive, the State required a portion of defendant's property, specifically a triangular shaped area located in the northeast corner of defendant's lot, measuring thirty feet in depth along the north line and approximately 89 feet across the front of his property. On the expropriated property there were shrubs and one live oak tree, but no buildings. Prior to the taking, defendant's property measured 153 feet on the front by a depth of 294 feet.
In controversies of this kind, the court must be guided by the testimony of expert witnesses. In determining the amount of damages, whether called severance or consequential, the testimony of the expert appraisers must stand the test of reasonableness. Opinion testimony is best based on the experience of the witness related to the particular problem before the court. Opinion testimony of experts who have experience in dealing with real estate within the area in which the subject property is located is entitled to greater weight than the testimony of an expert without such actual and practical experience.
As severance damages, the landowner is entitled to be awarded the difference between the market value of the property immediately prior to and immediately after the taking. This statement is too well established in our jurisprudence to need citation.
Frequently there is less divergence of opinion in determining the value of property prior to expropriation than there is in arriving at the market value of property after taking. No two severances are alike in most cases. Each expropriation must be considered in the light of the circumstances of severance created thereby.
Where there is a wide divergence or difference of opinion between the market value of property after the taking of witnesses for the State on the one hand and the defendant homeowner on the other hand, and such vast conflict cannot be reconciled otherwise, the court must look to the testimony of these experts to determine which is well grounded in good reasoning.
There does not appear to be very great difference of opinion of value of the defendant's *645 property prior to the expropriation. In fact, the plaintiff's witnesses attributed a greater value to the property prior to taking than did defendant's witnesses. For the plaintiff, Mr. Cobb appraised the property to be worth $97,800 and Mr. LeJeune, $97,410, whereas for the defendant, Mr. Brown found a value of $87,500 and Mr. Perkins computed the value to be $90,000. It was the value of the property after the taking which brought about the greatest differences. Mr. Cobb considered the property to be worth, on the market, the sum of $88,800, and Mr. LeJeune figured it to be worth $88,710. Mr. Brown testified he found the value after the taking to be $47,500 and Mr. Perkins reasoned the value to be $50,000.
From the standpoint of experience there is no question or doubt Mr. Brown and Mr. Perkins are the much more qualified to express an opinion as to worth of the property after the taking. The reasons stated by these witnesses favorably impressed the trial court, and we are likewise impressed with their testimony.
Mr. Cobb and Mr. LeJeune are certainly well qualified as expert appraisers, and the trial judge was correct in accepting them as experts in their field. Both of these gentlemen readily admitted they had no experience in dealing in real estate in the City Park and University Lakes area or in dealing with clientele interested in either selling or buying homes within the price range of this defendant's property. Mr. Cobb testified about ten per cent of his time was devoted to real estate sales and ninety per cent to appraisal work. Mr. LeJeune testified all of his time was devoted to making appraisals.
For the plaintiff, Mr. Cobb advocated the building of a brick fence along the westerly portion of the north line of defendant's property which would, he says, "completely divorce the remaining site from the interstate highway and this could be built for around what I estimated at around $2,100.00. The valuethe damage to the remainder I estimated at around six per cent which came to around $5,820.00."
In answer to the trial court's inquiry as to how the six per cent estimate was arrived at, Mr. Cobb stated he had talked to other people in similar situations both in this area and in other areas, and that was the figure he came up with as his estimate.
Mr. LeJeune testified he estimated the severance "damages was limited by the cost to cure the damage." He further testified (page 132) "* * * I have allowed an amount of $7,675.00 for damages which, in my opinion, was the amount necessary to cure the damage by putting a brick fence down the north property line of the subject property. That was my damage item. * * *." This witness stated that in his opinion all that was necessary to restore the property to the value it had prior to the taking was to build this brick fence eight feet high along the entire north line a distance of 294 feet. He was steadfast in his opinion that there was no other consideration to be given the matter of severance damages.
We are unable to accept the State's witnesses' appraisal of severance damages. We find the reasoning of both Mr. Cobb and Mr. LeJeune, and the quantum determined by them, to be unsatisfactory and unrealistic to the facts of this expropriation.
The record fully supports the conclusion of the District Judge. The defendant offered the testimony of two eminently qualified realtors of this area. Both of these witnesses for a number of years have dealt in property of this type in this particular location and area. They are thoroughly versant in the determination of values of real estate in and around City Park and University Lake areas. Their vast and wide experience in dealing with property of this class and value enables them, with authority, to place a value on the property in its present state. These gentlemen are able to evaluate and relate the depreciation of appearance, loss of frontage and of *646 view to the present worth. These witnesses know the "prestige buyer" and his requirements. These witnesses testified that the defendant's property once was prestige property but now with the completion of the Interstate highway obviously the property would be no longer such type property.
In this regard, Mr. Perkins testified:
"Q. Well, Mr. Perkins, you still have, of course on this lot this substantial home which you indicated was in excellent condition. What circumstances have occurred which would lead you to the conclusion that the property today has a value of only fifty thousand dollars?
"A. First, we must keep in mind when we say fifty thousand, we are not talking about a cheap home. That is still a pretty good price for someone to pay for a home, but you have reduced it from the real prestige purchaser, in my opinion, to one who would be willing to pay perhaps fifty. Personally, even with Mr. Singletary sitting there, I wouldn't have it to live in as my home at any price, but before I would have loved to have had it, and I think that would be the reaction of the typical or of most purchasers that would look at it. I don't think they would but it because they could get it cheaper. I don't think they would buy it period, but I do think someone would buy it, and in my opinion, fifty would be the top price. Nowwhy? Anyone looking at it must realize, of course, that the expressway is there, and it wasn't built just to be there. It is going to be used. The use of the expressway is going to create a number of problems. There is a downramp that comes right by Mr. Singletary along the edge of the property. There is a wall that has been built in the front of his property. He no longer has the use of Dalrymple Drive for all practical purposes, but he has to come in from the side street. If he entertains, the guest who used to could come and park along the front can no longer do so. That is gone, and with football being an interesting season, a lot of us look forward to the yearly party at Mr. Singletary's. If he has it this year, I don't know where the guests would park. They couldn't park where they used to park. Those are items you at least have to consider. The view has been completely changed. I can't imagine anyone saying that the expressway is pretty unless it was the engineer that designed it. It is not attractive, and it certainly is not attractive for residential purposes. The only way it could increase the value of property, I think, would be in those cases where it makes residential come reasonably close to town but not being adjacent to the expressway or in those cases where it creates commercial use of property close to it. I am not talking about those cases. I am talking about the case of a prestige home that had all the advantages that you would expect in buying a prestige home and then suddenly they are gone. You have the same home but you don't have all the other things that would make you want to buy the home."
Mr. Brown gave, in part, the following testimony:
"Q. Now, we were talking about depreciating factors, and you have got the elevation, the elevation of the expressway, the noise, the vibration and debris, the changes in the character of the front because of the downramp and depriving him of entertaining facilities and now what else?
"A. That's principally it, Judge. I think those are important. I think that when you get, when you approach fifty thousand dollars in the price of a home, you are dealing with a person who is, as I have said before, he is buying more than shelter, and he is critical and he wants as near a perfect property as he can get for the money that he has to spend, so I think, though there hasn't been as much said about it here today as I think its importance justifies, perhaps *647 probably the most damaging thing in my opinion is the fact that this property even if you had no noise from it and no vibration, what gave this property value before was its location overlooking a beautiful lake. This lake has been a prestige area ever since it was developed. At one time I guess seventy-five per cent of the finest or better homes in Baton Rouge were grouped around it, and the difference between the lots in this area that brought as high as $268.00 a front foot and the ones back of it, the same subdivision or in other areas of town that sell from sixty dollars a front to a hundred dollars a front is the lake front. Now, you can find lots of parallels to that. If you go to the Pacific coast communities, people have built magnificent homes at great expense on cliffs overlooking the ocean, and they pay big prices for that, and yet a home on the other side of the mountain or other side of the cliff, if you don't have the view, the value is not comparable at all, so the reason people selected this area for expensive homes and not in the area behind it is because of the lake view, and the lake view is important in value becaues it is a natural thing of beauty and now we have substituted for that the highway bridge. To me it is, if anything, I have underestimated its damaging effect in my own opinion. We find that people spending a lot of money for a home are extremely critical."
Both Mr. Perkins and Mr. Brown were in agreement the construction of the brick wall would not eliminate the effect of the downramp. The opinions of these two witnesses is based on their experience in the real estate business. Their opinions are well grounded from the standpoint of good reasoning, as the jurisprudence requires.
Apropos here is what the court said in State Through Dept. of Highways v. Lumpkin (La.App. 1962) 147 So.2d 80:
"These witnesses, we conclude, were intimately qualified to appraise and evaluate the property herein involved and with which they were familiar. State Through Dept. of Highways v. Milam, La.App.2d Cir., 1961, 130 So.2d 145. Moreover, these witnesses fulfill the particular requirement that appraisers, in such actions as this, be ` * * * familiar with land values in the vicinity of the property to be taken.' LSA-R.S. 48:443."
Also appropriate is what the court said in State Through Dept. of Highways v. Dodge (La.App. 1964) 168 So.2d 430:
"The rule applicable here is that the testimony of each expert should be considered and given effect if that testimony appears to be well grounded from the standpoint of sincerity and good reasoning. The expert testimony may be disregarded, however, if it impresses the court unfavorably. State, Through Department of Highways v. Bourque, La. App. 3 Cir., 127 So.2d 784; State, Through Department of Highways v. Stoer, 238 La. 718, 116 So.2d 498; and Housing Authority of New Orleans v. Boudwine, 224 La. 988, 71 So.2d 541.
* * *
"The testimony of the appraisers called by defendant indicates to us, as it apparently did to the trial judge, that these experts were sincere and that their opinions as to the value of the subject property are well grounded from the standpoint of good reasoning. We conclude, therefore, that the trial judge did not err in considering the opinions as to value expressed by the two appraisers called by the defendant."
The State complains of the trial court permitting the introduction of any evidence on the question of view or loss of view. The evidence was properly admitted.
Loss of view per se is not compensable as a separate item of damage, but nevertheless is an element of damage and *648 may be considered by the appraisers in estimating or determining the commercial value of the property remaining after expropriation.
See 29A C.J.S. Eminent Domain § 105 (2) p. 429 and § 167, p. 718.
Also see East Baton Rouge Parish Council v. Koller, La.App., 94 So.2d 505; Schneidau v. Louisiana Highway Commission, 206 La. 754, 20 So.2d 14; Louisiana Power & Light Company v. Dileo, La.App., 79 So.2d 150.
The State cites us the cases of State Through Dept. of Highways v. Johnson (La.App.1964) 168 So.2d 389; State Through, Dept. of Highways v. Bourq (1961) 135 So.2d 600, and State Through Dept. of Highways v. Leger (La.App.1965) 170 So.2d 399, to support its contention six per cent damage is more than adequate. In the Johnson case a residence was left seventeen feet from the new highway right of way. Therein the court allowed the defendant ten per cent diminution in its value. In the Bourq case, defendant's house was left only eight feet from the new right of way line and the court held it was diminished in value by about ten per cent. In the Leger case, the State's estimate of consequential damages was $970, however, the appellate court awarded an amount approximately ten times that amount in compensation for severance damages.
We have before us here an entirely different situation; a different expropriation; a different type of property involved. The forces acting on the determination of severance damages are peculiar to the facts and circumstances of this particular expropriation. Each case must be considered in the light of the circumstances surrounding each taking as it arises.
We find the judgment appealed from is correct and is affirmed.
Affirmed.